**In re Henry RICHARDSON, Debtor.**

**Bankruptcy No. 97–10737.**

United States Bankruptcy Court,
M.D. Louisiana.

Feb. 4, 1998.

---

Stephen K. Peters, Baton Rouge, LA, for Debtor.

Blake E. Rizzo, Kizer, Hood & Morgan, L.L.P., Baton Rouge, LA, for Hibernia National Bank.

Annette C. Crawford, Baton Rouge, LA, Standing Chapter 13 Trustee.

## RULING

LOUIS M. PHILLIPS, Bankruptcy Judge.

The matter before the Court is a Motion to Dismiss this Chapter 13 case, which requires that this Court determine which of the competing interpretations of 11 U.S.C. § 109(g)(2) is correct. For the following reasons, the Court interprets the statute to dictate dismissal of a case when a debtor has been a debtor in a case pending within 180 days prior to the present case, in which voluntary dismissal was requested and obtained after a creditor filed a motion for relief from the automatic stay. Since those facts are present, the Court has ordered this case dismissed, after ruling in open court. Because of the absence of binding authority in this Circuit, and to effectuate the dissemination of the law here (in this Court), the following written reasons supplement the Court's oral ruling and constitute the opinion of the Court.

## FACTS AND PROCEDURAL HISTORY

Henry Richardson (Richardson) filed a Chapter 13 petition on December 13, 1995. That petition generated case number 95–11599 (the 1995 case). Hibernia National Bank (Hibernia), a secured creditor, held a first mortgage on Richardson's residence. During the early part of 1996, Richardson

failed to pay the installments on his mortgage note, and on August 5, 1996, Hibernia filed a Motion for Relief from the Automatic Stay. The parties resolved the motion through a consensual modification of the Automatic Stay that allowed Hibernia to seek ex parte relief in the event of further default. That eventuality occurred, and on February 28, 1997, Hibernia filed an ex parte Motion for Relief from Automatic Stay. The Court granted the motion on March 6, 1997. On March 18, 1997, the debtor sought dismissal of his Chapter 13 case. The Court dismissed the case on March 20. On March 30, Hibernia filed an action in state court to obtain possession of the mortgaged property. On April 11, 1997, Richardson filed another Chapter 13 petition (the 1997 case), thus effectively staying Hibernia's state court foreclosure action.[1]

Hibernia seeks dismissal of the 1997 case, arguing that § 109(g)(2) mandates dismissal because Richardson filed his petition 22 days after obtaining a voluntary dismissal of the 1995 case, in which a creditor (Hibernia) had previously filed a motion for relief from the automatic stay.[2] Hibernia cites the following cases in support of its position: *Matter of Ulmer*, 19 F.3d 234 (5th Cir.1994); *Kuo v. Walton*, 167 B.R. 677 (M.D.Fla.1994); and *In re Keul*, 76 B.R. 79 (Bankr.E.D.Pa.1987). Richardson argues that the motions for relief filed by Hibernia in the 1995 case were no longer pending at the time of dismissal, and § 109(g)(2) is therefore inapplicable. He cites *Matter of Phillips*, 844 F.2d 230 (5th Cir.1988); *In re Jones*, 99 B.R. 412 (Bkrtcy. E.D.Ark.1989); *In re Milton*, 82 B.R. 637

(Bkrtcy.S.D.Ga.1988); and *In re Patton*, 49 B.R. 587 (Bkrtcy.M.D.Ga.1985).

## APPLICABLE LAW

11 U.S.C. § 109(g) provides, in relevant part:

> Notwithstanding any other provision of this section, no individual or family farmer may be a debtor under this title who has been a debtor in a case pending under this title at any time in the preceding 180 days if—

>> (2) the debtor requested and obtained the voluntary dismissal of the case following the filing of a request for relief from the automatic stay provided by section 362 of this title.

Despite its apparent simplicity, the statute has generated several competing interpretations. None of these approaches has been formally adopted by holdings of the Fifth Circuit or the District Court for the Middle District of Louisiana, and until now this Court has not issued an opinion on the question. We begin by surveying the various interpretations of the statute.

## GENERAL RULE: SECTION 109(g)(2) IS UNAMBIGUOUS

Most courts hold that the meaning of § 109(g)(2) is plain and unambiguous, and that the language of the statute dictates a broad rule of dismissal. A majority of the courts who find that the language of the statute is unambiguous will order dismissal of a case whenever the criteria of the statute as they read it are satisfied. These courts find that it leaves no room for interpretation, discretion, or consideration of equity. Some courts, while finding the language of the

---

**1.** Some courts have held that the purported filing of a case that is barred by § 109(g) does not create an automatic stay, because a petition filed by a person ineligible for bankruptcy relief does not commence a bankruptcy case. *In re Hollberg*, 208 B.R. 755 (Bankr.D.D.C.1997). Without expressing an opinion on that issue, the Court observes that a creditor attempting a foreclosure is in a precarious position if it decides (without the benefit of a hearing) that the debtor's new case is barred, and that the creditor can therefore foreclose with impunity. The creditor's position is even more perilous if the creditor forecloses in a jurisdiction that has interpreted the applicability of § 109(g)(2) to be subject to the

court's discretion. Further, in the Fifth Circuit, § 109 has been held to provide grounds for dismissal of cases over which the court has jurisdiction, i.e., that § 109 is not jurisdictional. See *Matter of Phillips*, 844 F.2d 230, 235 n. 2 (5th Cir.1988).

**2.** There is no question here concerning whether the 180 day period is implicated, and therefore the question (if there really is one) of when the running of the period commences (signing of the order of dismissal, entry of the order of dismissal, or expiration of the appeal delay respecting the order of dismissal) will not be dealt with.

statute unambiguous, refuse to apply the statute as they read it, and inject an element of judicial discretion into the applicability of the statute. An unspoken assumption in all of these opinions is that the plain meaning of the word "following" is "after." [3]

## FIRST APPROACH: THE MEANING OF SECTION 109(g)(2) IS PLAIN, AND IT SHOULD BE APPLIED AS WRITTEN

The leading case that finds the language of the statute unambiguous, and then applies it as written, is *In re Andersson*, 209 B.R. 76 (6th Cir. BAP 1997).[4] The facts of that case are virtually indistinguishable from those in Richardson's case. In *Andersson*, the debtors obtained a voluntary dismissal of their first Chapter 13 case after a creditor had requested relief from the automatic stay. They filed a second Chapter 13 case within 180 days of the dismissal of the first, to prevent the creditor from foreclosing on their house. The bankruptcy court dismissed the second case, and the appellate panel affirmed the dismissal. The *Andersson* court observed that the United States Supreme Court prefers for lower courts to "presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut National Bank v. Germain*, 503 U.S. 249, 253–254, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). In other words, when a statute is unambiguous, interpretation of that statute should begin and end with its text. The *Andersson* court adopted (implicitly) the simplest applicable meaning of "following", which is "after." It concluded that the "plain meaning" rule of statutory interpretation compelled that result. Since the text of the statute, as interpreted, mandated dismissal on the facts be-

fore it, the *Andersson* court considered its task to be at an end, and affirmed the bankruptcy court.

## SECOND APPROACH: THE MEANING OF SECTION 109(g)(2) IS PLAIN, BUT IT SHOULD NOT BE APPLIED AS WRITTEN

A number of courts holds that cases such as *Andersson* interpret the language of § 109(g)(2) correctly (i.e., they conclude without discussion that "following" means "after"), but that a literal application of the statute is undesirable. These courts offer differing reasons for their decision not to follow the literal language of the statute. Some hold that it would lead to absurd, inequitable, or unfair results. *In re Luna*, 122 B.R. 575 (9th Cir. BAP 1992). Others hold that they should apply the statute as Congress intended it, rather than as Congress wrote it, and that Congress intended the statute to operate only in a limited number of the cases that would be covered by its language. *In re Santana*, 110 B.R. 819 (Bankr.W.D.Mich.1990).

In *Luna*, the debtor filed a second bankruptcy petition within 180 days of the voluntary dismissal of her previous case. In the first case, a creditor. Home Savings, had requested and obtained relief from the automatic stay in order to sell previously foreclosed property. Despite its knowledge of the second petition, Home Savings sold Luna's property three weeks after the second filing date. The court interpreted *In re Jones*, 99 B.R. 412 (Bankr.E.D.Ark.1989), and *Matter of Milton*, 82 B.R. 637 (Bankr. S.D.Ga.1988), as holding "that the application of section 109(g)(2) is discretionary."[5]

---

**3.** Most courts do not explicitly consider the meaning of the word "following" in the context of § 109(g)(2). They assume that "following" means "after", and debate whether the presumably obvious language of the statute should be applied as written, or whether the court can apply the statute as it chooses. Those courts that find they must apply the statute as written (the majority) refer to it as "mandatory." Those opposed to application of the statute as written find an element of discretion. This Court disagrees with all of these courts on a preliminary issue: whether the meaning of the statute is so clear that there is no need to discuss it.

**4.** Others include *In re Bigalk*, 813 F.2d 189 (8th Cir.1987); *In re Dickerson*, 209 B.R. 703 (W.D.Tenn.1997); *Kuo v. Walton*, 167 B.R. 677 (M.D.Fla.1994); *In re Jarboe*, 177 B.R. 242 (Bankr.D.Md.1995); *In re Gregory*, 110 B.R. 911 (Bankr.E.D.Mo.1989). See also, *In re Jackson*, 184 B.R. 16 (D.N.J.1995); *In re Narod*, 138 B.R. 478 (E.D.Pa.1992); *In re Denson*, 56 B.R. 543 (Bankr.N.D.Ala.1986); *In re Keziah*, 46 B.R. 551 (Bankr.W.D.N.C.1985).

**5.** See text accompanying footnotes 10 and 11 for a further discussion of these cases. Contrary to the assertion of the *Luna* court, these cases actually stand for the proposition that § 109(g)(2)

*Luna,* 122 B.R. at 577. The court then held that it would adopt this discretionary approach because to do otherwise "would reward Home Savings for acting in bad faith [by wilfully violating the automatic stay in the second case] and punish Luna for acting in good faith [by seeking to have the bankruptcy court resolve a dispute over possible redemption of the mortgaged property]." *Id.*

In *Santana,* on similar facts, the court concluded that the language of § 109(g)(2) was unambiguous, and that, if applied as written, the statute dictated dismissal. However, the court went on to state that "to apply it literally to the facts now before me would produce, if not an absurd result, then certainly one which goes far beyond the scope of the abuse which it appears Congress was attempting to cure." *Santana,* 110 B.R. at 821. Consequently, the court chose not to apply the statute as written, and denied the creditor's motion to dismiss.

One case purports to adopt "an intermediate approach" somewhere between the *Andersson* and *Luna* camps. *In re Ramos,* 212 B.R. 29, 30 (Bankr.D.P.R.1997). There, the court recognized that some courts interpret § 109(g)(2) as "mandatory" while others find an element of "discretion." The court then stated that its intermediate approach "recognizes that the language of the statute is mandatory, but suggests that there may be situations where the court will suspend enforcement of the statute for equitable reasons." *Id.* The court then found that the case before it was such a situation, and refused to apply the statute as the court had interpreted it. The court did not explain the source of the judicial power it relied upon to "equitably suspend" enforcement of an act of Congress. See also *In re Hamm,* 157 B.R. 137 (Bankr.E.D.Mo.1993).[6]

## ALTERNATIVE ANALYSIS: WHAT EXACTLY DOES "FOLLOWING" MEAN?

A few cases opt for a different analytical framework altogether. These cases focus on the meaning of the word "following," and the result reached in each of these cases is dictated by the definition that the court adopts. As indicated, most courts, regardless of result, assume without discussion that "following" means "after." Some courts have interpreted the word to mean "because of," and have thus read the statute to require a causal connection between the motion for relief and the motion for dismissal.[7] Finally, according to cases such as *Jones,* supra, and *Milton,* supra, the statute should be read in such a manner that a motion for voluntary dismissal will be deemed to "follow" a motion for relief from stay only if the motion for relief from stay is still pending at the time the motion for dismissal is filed.[8]

## THIRD APPROACH: "FOLLOWING" MEANS "BECAUSE OF"

At least two opinions explicitly discuss the meaning of the word "following." *In re Duncan,* 182 B.R. 156 (Bankr.W.D.Va.1995); *In re Copman,* 161 B.R. 821 (Bankr.E.D.Mo. 1993). In *Copman,* the court surveyed the

applies only when a motion for relief is pending at the time of the voluntary dismissal.

**6.** Which of necessity results in the court failing to explain how it has not violated the directive issued by the Supreme Court that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988). In fact, the improper use of this imagined extension of the powers of "equity" probably short circuits the possibility of legislative repair of any statute whose words require consequences different from the purported legislative intent (which is not to say that legislative intent is not carried out by the interpretation given § 109(g) by this Court). If courts are free to "fix" statutes on a case-by-case basis, Congress is never faced with the problem generated by what the statute says, if in fact, there is one. What ultimately is revealed, however, is judicial fiat "designed" to "do right" as a particular judge sees fit. Doing right this way is the wrong way to go.

**7.** *In re Duncan,* 182 B.R. 156 (Bankr.W.D.Va. 1995); *In re Copman,* 161 B.R. 821 (Bankr. E.D.Mo.1993).

**8.** See also *In re Patton,* 49 B.R. 587 (Bankr. M.D.Ga.1985). These cases do not hold that the application of § 109(g)(2) is discretionary. Rather, they hold that the statute applies only when a motion for relief is pending before the court at the time of dismissal.

prior cases, then stated "While the reasoning in the Santana case is persuasive, this Court will not ignore the plain language of the statute." *Copman,* 161 B.R. at 823. The court noted that the word "following" could be interpreted to imply a causal connection. Furthermore, it noted that § 109(g)(2) is applicable only when the debtor both requests and obtains voluntary dismissal of his case after the creditor's motion for relief from stay. The court found that this requirement indicated that Congress intended a causal connection to exist. The court concluded that there was no causal connection in the case before it, and therefore that the statute was inapplicable by its own terms.

The *Duncan* court took *Copman*'s approach one step further, and sought to find the plain meaning of the word "following." The court cited Webster's II New Riverside University Dictionary 493 (1988) for these definitions of "following:" [9] 1. To come or go after ... 5. To be the result of ... 9. To be evident as a consequence of ... vi. 1. To come, move, or take place after another person or thing in order or time. 2. To occur or be evident as a consequence: Result. *Duncan,* 182 B.R. at 159. Similarly, Roget's II: The New Thesaurus 200 (1980) defined follow as "To occur after (another) in time ... Syns: follow on, succeed, supervene ... 6. To occur as a consequence ... Syns: attend, ensue, result." *Id.* Based on these authorities, the *Duncan* court decided that "the ordinary definition of the word 'following,'" *Id.,* was "because of." Therefore, according to *Duncan*'s reasoning, the court must determine whether the debtor's motion to dismiss the case was causally related to the

earlier motion for relief from the automatic stay. If the court, in its discretion, determines that insufficient causation exists, then the court should declare that the statute, by its own terms, is inapplicable because the voluntary dismissal did not "follow" the motion for relief.

### FOURTH APPROACH: "FOLLOWING" MEANS "AFTER (AS LONG AS THE PRECEDING MOTION IS STILL PENDING)"

According to the courts adopting the "pending" approach,[10] the statute applies only when a debtor seeks dismissal while the motion for relief from automatic stay is still pending. If the motion to lift the stay has been denied, granted, or otherwise resolved, these courts treat the motion as being no longer before the court, and hence, incapable of being "followed."

### DISCUSSION OF APPROACHES; FIGURING OUT THE MEANING OF "FOLLOWING"

Since § 109(g)(2) has generated three different lines of authority for the meaning of the word "following," this Court cannot agree with the *Andersson* court that the text of the statute is so plain that it can be applied without further analysis. The Court must first determine which of the three competing definitions of "following" is appropriate.

The "pending" approach, favored by the debtor in this case, is noteworthy primarily because dicta in two Fifth Circuit opinions can be read to favor it.[11] With due regard to

---

9. These are actually definitions for the word "follow," rather than "following."

10. *In re Jones,* 99 B.R. 412 (Bankr.E.D.Ark. 1989); *Matter of Milton,* 82 B.R. 637 (Bankr. S.D.Ga.1988); *In re Patton,* 49 B.R. 587 (Bankr. M.D.Ga.1985).

11. *Matter of Ulmer,* 19 F.3d 234 (5th Cir.1994); *Matter of Phillips,* 844 F.2d 230 (5th Cir.1988). In *Phillips,* a creditor filed a motion to dismiss a debtor's case under § 109(g)(2). The bankruptcy court denied the motion, and the creditor appealed. The District Court dismissed the appeal as moot, because the debtor had already received a Chapter 7 discharge before the appeal was heard. The creditor then appealed to the 5th Circuit, which dismissed the appeal because the

bankruptcy court's order was not a final order, and because the District Court's dismissal of the appeal as moot did not create appellate jurisdiction in the 5th Circuit. In summarizing the facts, the court mentioned that the bankruptcy court had "held that the bank had not shown that Phillips had abused the bankruptcy system; that the bank had not shown any prejudice resulting from the prior dismissal of the Chapter 13 proceeding, and that Phillips in effect had converted her Chapter 13 case to a Chapter 7 case." *Phillips,* 844 F.2d at 232. Richardson cites this case, apparently believing that the court's recitation of these facts without comment indicates approval of the bankruptcy court's methods. This Court does not read *Phillips* in that fashion. The 5th Circuit in *Phillips* did not

the Fifth Circuit, the Court is compelled to conclude that this is the weakest candidate for the meaning of "following."

If one accepts for the sake of discussion the idea that § 109(g)(2) applies only when the motion for relief from stay is pending at the time of the voluntary dismissal, several anomalies result. There are several ways in which a motion for relief from stay can be no longer pending, and therefore fail to trigger § 109(g)(2). The motion could have been dismissed or denied, it could have been withdrawn, or it could have been granted. The "because of" courts would generally find § 109(g)(2) inapplicable in situations in which the motion for relief had been withdrawn, dismissed, or denied prior to the motion for voluntary dismissal. Consequently, the only meaningful distinction between the "pending" approach and the "because of" approach is that the former would refuse to apply § 109(g)(2) in a situation in which the creditor's motion had been granted, while the latter would find the statute applicable in those circumstances.

A motion which has been granted is no longer pending, so the "pending" courts would not apply § 109(g)(2) if the motion for relief in the previous case had been granted.

However, that is exactly the sort of situation that the statute is designed to prevent, and it is the situation before this Court. If a creditor wins its motion for relief from stay, as Hibernia did, it can renew state court foreclosure efforts, as Hibernia did. According to the "pending" approach, a debtor could seek and obtain voluntary dismissal of his case, and thereafter refile (as Richardson did) with impunity, prior to foreclosure. It makes no sense to punish a debtor for dismissing his case and then refiling when a motion for relief has not yet been granted, while refusing to punish a debtor for dismissing and refiling when the creditor has already obtained relief from stay. The waste of judicial resources is greater in the second case, and the harm to the creditor is greater. See *In re Dickerson,* 209 B.R. 703 (W.D.Tenn.1997).

One might counter this observation by arguing that the "pending" courts did not intend to invalidate the statute in such circumstances, and that they would find § 109(g)(2) inapplicable only when the creditor's motion for relief was dismissed, denied, or withdrawn. If that is true, then their position is indistinguishable from that of the "because of" courts, and there are really only two

address the issue before this Court, and any attempt by this Court to find guidance in the above language would be in vain.

*Ulmer* offers more support for Richardson's position, although it was paradoxically cited by Hibernia, and not by Richardson. In footnote 9, 19 F.3d at 236 n. 9, the court states that the "pending" approach "finds support both in the language and the purpose" of the statute. The court continues "If the request for relief ... is no longer before the court, one can reasonably conclude that the request for voluntary dismissal did not follow the former request but rather occurred independently." *Id.* The court cites *Patton,* supra, and *Milton,* supra. This Court finds that the *Ulmer* court did express a preference for the "pending" approach. However, contrary to the views expressed in *Ulmer,* the circumstances of this case show that the "pending" approach actually exacerbates the problem to which all courts who have weighed in believe (perhaps to different degrees) Congress was responding. Here, Richardson filed his second case 22 days after dismissal, and only days before Hibernia's scheduled foreclosure. While this Court's interpretation of the statute renders a determination of motive unnecessary, the Court finds it difficult to believe that Richardson's actions occurred in-

dependently of Hibernia's. In fact, it is more reasonable to surmise that the debtor, hoping this Court would see the *Ulmer* musing as binding precedent and having no answer to the motion for relief from stay in the first case, offered no defense, "suffered" the granting of the motion (which caused it to be no longer pending), waited until the foreclosure was in view, and effected both voluntary dismissal and refiling prior to foreclosure. The *Ulmer* venturing therefore creates perverse incentives for 1) the creditor not to file a motion for relief from stay unless the granting of it will somehow be postponed; and 2) the debtor who has no defense to the motion to press—through inaction or even active capitulation—for the granting of the motion so that it can be taken off the "pending" list and the debtor can therefore be absolved of the stricture of § 109(g)(2). So, can the Fifth Circuit really be comfortable with advancing the (unnecessary) suggestion that § 109(g)(2) is designed to forestall the issuance of orders granting relief from stay and to provide safe haven to the debtors against whom relief is granted? Because the *Ulmer* court's statement was not necessary to resolve the dispute before it, 19 F.3d at 236, this Court refuses to be "guided" by the *Ulmer* dictum.

alternative interpretations. (Also, one sees that if this approach—i.e. "not pending" will not be "not pending" if a motion is "not pending" because it has been granted, but "not pending" will be "not pending" if the motion is "not pending" because it was denied, withdrawn, or dismissed—creates alternative definitions of "not pending" which, although creative, are utterly disassociated from the words themselves.)

Finally, and in addition, the "pending" approach fails to give credence to the language of the statute. While a statute reading "following *a motion* seeking relief from stay" could conceivably be interpreted to require a pending motion (i.e., if the prior motion had been disposed of in any manner, perhaps there would be no motion after which the dismissal would be sought), the statute as written cannot. It is not the motion that is the pivotal precursor, but *the filing of the motion.* Reference to the filing of the motion, without more (and there is no more within the words of the statute), precludes analysis of the ultimate resolution of the motion (or, conversely, its being pending). Resolution of a motion for relief from stay may effect whether (semantically) there remains a motion on the Court's docket (in case administration parlance a motion, once resolved by order, is "terminated"), but resolution has no effect whatsoever on whether the motion was filed. Once filed, it is always filed (unless, one might argue, the pleading is stricken/canceled by court order, and thereby removed from the docket).

■ The approach which interprets "following" to mean "because of" has more credence, though this Court has determined that while the *Duncan* court asked the right question when it sought to determine the ordinary definition of the word "follow," it gave the wrong answer.[12] The primary definition of "follow" is "to occur after." Both of the language authorities cited in *Duncan* listed "to occur after" as a definition before they mentioned anything dealing with causation. The same is true in other sources. Black's Law Dictionary offers no definition for "following," but three definitions for "follow." They are paraphrased as follows: to conform or comply, or be determined by (as in, costs follow the outcome of the lawsuit); to accept as authority (this Court is bound to follow Fifth Circuit precedent); and to go, proceed, or come after. Black's Law Dictionary 643 (6th Deluxe Ed.1990). "To come after" is the only non-legal definition offered. "Resulting from" is not mentioned. Webster's New World Dictionary 524 (3rd College Ed.1988) lists fourteen transitive and two intransitive[13] definitions for "follow." The first transitive and first intransitive definitions may be paraphrased as "to come after," while "to result from" is the eighth transitive definition offered, and the second intransitive. The Court concludes that, although the meaning of the word "following" encompasses both "after" and "because of," the ordinary, pri-

**12.** The *Copman* court also focused on the word "following," but misunderstood the significance of the dual requirement that the voluntary dismissal be both requested and obtained following the motion for relief from stay. The *Copman* court stated that "by requiring that the debtor both 'request' and 'obtain' the dismissal after the request for relief, the statute requires a causal connection such that the request for relief triggers the dismissal." *Copman*, 161 B.R. at 823. The language of § 109(g)(2) does not contradict the *Copman* court's reading, but a more persuasive interpretation has been suggested. The "requested and obtained" language was most likely intended to protect those debtors who request dismissal before the creditor's motion is filed, but whose cases are not dismissed until after such a motion. See *In re Eason*, 166 B.R. 793 (E.D.N.Y.1994); *In re Hicks*, 138 B.R. 505 (Bankr.D.Md.1992). Obviously, a debtor must request a voluntary dismissal before he can obtain it. If he requests the voluntary dismissal and obtains it before the creditor files a motion for relief, then there is no longer a case to be concerned with, prior to the filing of the motion (which, come to think of it, shouldn't happen). If the debtor requests the dismissal before the creditor seeks relief from stay, then his request is probably not caused by the creditor's future action. It is only when the debtor's request follows the creditor's motion that abuse is likely.

**13.** A transitive verb is one that requires a direct object to avoid ambiguity. An intransitive verb does not. For example, if one asked "Which line of authority will you follow?," a reply of simply "I follow" would be ambiguous, because the context requires a transitive verb. (Note: this footnote emanated from this Court's acknowledgment to the Court's law clerk that it did not understand all the talk about transitive and intransitive.)

mary meaning of "following" is clearly "after." [14]

■ "Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'" *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 388, 113 S.Ct. 1489, 1494, 123 L.Ed.2d 74 citing *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). This court has determined that the ordinary, common meaning of "following" is "after." The word "following" should therefore be interpreted to mean "after," unless such a reading would generate absurd results, or unless there is sufficient indication from the position of the word in the statute (or other contextual signs) that Congress intended the word to convey a secondary meaning. *Pioneer*, supra, 507 U.S. at 388, 113 S.Ct. at 1494. Because, as we attempt to convey below, neither of these exceptions is present here, this statute mandates dismissal of all cases which are filed within 180 days after the voluntary dismissal of a prior case if the voluntary dismissal was moved for and obtained after the filing of a motion for relief from stay (regardless of connexity, pendingness, etc., etc.).

## *DOES THIS READING GENERATE ABSURDITY (OR WHATEVER OTHER PROBLEMATIC CONSEQUENCES WOULD ALLOW SUSPENSION OF THE STATUTORY MANDATE)*

Now, some courts say that interpreting the statute as mandating dismissal generates an absurd result, and they therefore conclude that it is necessary to graft an element of judicial discretion on to it. These courts point to situations in which the motion for relief from stay is denied or withdrawn, or cases in which the debtor seeks a voluntary dismissal for reasons completely unrelated to the motion for relief from stay. It is suggested in these opinions that Congress could

not have intended to penalize debtors who have legitimate reasons for seeking dismissal and are obviously not abusing the system, and that to penalize a debtor for an abuse of the system which he has not committed is absurd. Before we discuss these cases this Court "feels" compelled to make certain it keeps in the forefront of its discussion the actual punishment that is inflicted upon the particular debtor who effects voluntary dismissal after, but for reasons unrelated to, a motion for relief from stay: the actual punishment, deprivation, or whatever is, and is only, that the same debtor cannot file another Chapter 13 bankruptcy case for 180 days, roughly six months, roughly half a year. No loss of limbs, no incarceration, no loss (as best we can tell) of any property.

*Ramos* and *Luna* are indicative of the cases that refuse to apply the statute as they read it, because such a reading would "work an injustice." *Ramos*, 212 B.R. at 30, or establish an "unjust, illogical, or capricious" statutory scheme. *Luna*, 122 B.R. at 577. Although not explicitly articulated, the "absurdity" or "injustice" these courts appear to fear is that of an innocent debtor being barred from filing bankruptcy for 180 days after voluntary dismissal, when the voluntary dismissal is not designed to abuse the bankruptcy system or defraud creditors. Even if one assumes that these courts are correct when they say that barring an innocent debtor would be unjust, or that the Bankruptcy Code's broad eligibility requirements indicate the existence of a Congressional policy to make bankruptcy relief widely available, these facts do not lead to a conclusion that the "after" interpretation of § 109(g)(2) is absurd.

■ The Fifth Circuit has stated that "we must apply a reasoned, objective method for determining whether a result is actually 'absurd' or whether, instead, it is simply personally disagreeable." *Johnson v. Sawyer*, 120 F.3d 1307, 1319 (5th Cir.1997). The court suggested "two sources to make this call—

---

**14.** The Court recognizes that, after several pages of laborious analysis, it has reached a conclusion ("following" means "after") which the *Andersson* court and many others assumed at the earliest stages of their opinions. While this Court agrees with the result in *Andersson*, and with most of

what is said there, it is not sufficiently secure or confident in its analytical prowess to embrace the *Andersson* methodology. The Court will plod along, as the tortoise, hoping to reach the destination at which other courts arrive in a single hare-like flash of unarticulated inspiration.

other provisions of the statute and legislative history." *Id.* Unfortunately; the other provisions of the Bankruptcy Code shed no illumination on the meaning of "following" in § 109(g)(2). The sparse legislative history of the statute, to the extent it can be relied upon, is also unhelpful.[15]

Because the sources suggested by the Fifth Circuit were unfruitful, this Court has turned to opinions published by the United States Supreme Court concerning adherence to the text of Congressional enactments. *Union Bank v. Wolas,* 502 U.S. 151, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991) is a case involving interpretation of § 547(c)(2) of the Bankruptcy Code. That section sets forth an "ordinary course of business" exception to the avoidance powers of the trustee. The trustee in *Wolas* sought to avoid a preferential payment to Union Bank. The lower courts found that § 547(c)(2) applied, and the trustee could avoid the preference. The Ninth Circuit reversed, but was reversed in turn by the Supreme Court.

As originally enacted, § 547(c)(2) included language stating "that the ordinary course of

---

**15.** Several courts have purported to examine the legislative history of this section. Most of those courts concluded that the legislative history justified their decision to disregard the statutory language. However, this court's examination of the legislative history reveals no such justification.

Section 109(g)(2) was added to the Code by Section 301 of Public Law 98–353, the Bankruptcy Amendments and Federal Judgeship Act of 1984. At that time it was § 109(f)(2). Most of the debate in the legislative history concerns an earlier version of § 109(f), which would have made debtors ineligible for Chapter 7 relief if the court found that they could afford to pay some amount to creditors from future income. That proposal met strong opposition, and it was replaced by the current version fairly late in the legislative process. That fact may explain why the Court was able to find only two references to the statute under consideration. The first is at S. Rep. 98–65, p. 74, a report accompanying the Omnibus Bankruptcy Improvements Act of 1983, an early version of the 1984 Act. It states: "The purpose of the new paragraph is to provide the courts with greater authority to control abusive multiple filings. The section as amended will prohibit any party from filing a petition who, within the previous six months, has had a previous petition dismissed for failure to abide by orders of the court or upon voluntary motion for dismissal." This statement is internally inconsistent, and fails to properly describe the statute it purports to explain. The first sentence of this statement, with its reference to "provid[ing] the courts with greater authority" suggests that in fact the statute's implementation will be left to judicial discretion. The second sentence refutes that suggestion when it uses the words "will prohibit." Those words are incompatible with discretion of any sort. Finally, the second sentence of the comment leads one to conclude that the statute bars all those who seek voluntary dismissal from refiling. The statute is narrower than the comment suggests, since it applies only to those who seek dismissal after a motion for relief from stay has been filed.

The other bit of legislative history is a comment offered by Professor Frank Kennedy, a bankruptcy professor at the University of Michigan. He informed the members of the Senate that he and Professor Countryman agreed that the statute was not needed, and that the courts already had "ample powers to dismiss or abstain.... It is better for the courts to deal with the kinds of situations proscribed by the statute under existing authority than to impose a flat proscription as the proposed amendment does." Hearings S. 333, at p. 326. Professors Kennedy and Countryman opposed the enactment of the statute. They read it, as this Court does, to create a "flat proscription." They preferred the existing law, which left such matters in the court's discretion. They lost. The Senate amended the statute anyway.

The above statements comprise the legislative history of this statute. This Court fails to see how anyone could seriously contend that these statements indicate that Congress intended the courts to have discretion in this matter. The only clear statement regarding the purpose of the statute is made by a law professor, and he thinks the statute is designed to eliminate discretion. Perhaps the absence of support for the position of the "discretionary" courts explains why these courts do not cite the legislative history, and instead rely on judicial sources in their efforts to determine the will of Congress.

The *Copman* court cited no legislative history. Rather, it cited the *Santana* court's discussion of the legislative intent. The *Santana* court cited three bankruptcy court opinions (one of which found the will of Congress in Collier's) and a statement by Senator Hatch regarding the overall purpose of the Consumer Credit Amendments. It found "most helpful" a statement by another bankruptcy court regarding the "perceived purposes of Section 109(g)(2)." *Santana,* 110 B.R. at 821. That statement included no reference to legislative history. This Court believes that the Supreme Court's precedents, discussed *infra,* make clear that the legislative history should have, at best, a minor role in statutory interpretation, and should never be relied upon to countermand the clear language of a statute. To the extent that the history of a Congressional enactment does have a role, surely it isn't too much to ask that courts try to find the will of Congress by examining statements made by Congress, rather than those made by other courts.

business exception did not apply unless the payment was made within 45 days of the date the debt was incurred." *Wolas*, 502 U.S. at 156, 112 S.Ct. at 530. This limiting language showed that the "ordinary course of business" exception was apparently designed to apply only to short term debt. In 1984, Congress amended § 547(c)(2) to delete all reference to a time-of-payment limitation. According to the respondent in the *Wolas* case, "this amendment was intended to satisfy complaints by issuers of commercial paper and by trade creditors that regularly extended credit for periods of more than 45 days." Id. at 157, 112 S.Ct. at 531. Therefore, according to the respondent, Congress intended the amended exception to continue to apply only to short-term debt. The Supreme Court disagreed, unanimously finding that the language of the statute controlled.

> We need not dispute the accuracy of respondent's description of the legislative history of the 1984 amendment in order to reject his conclusion. For even if Congress adopted the 1984 amendment to redress particular problems of specific short-term creditors, it remains true that Congress remedied those problems by entirely deleting the time limitation in § 547(c)(2). *The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning.*

*Wolas*, 502 U.S. at 157, 112 S.Ct. at 531 (citations omitted)(italics added).

The above language makes it perfectly clear that when a conflict exists between what Congress said and what Congress presumably intended, the language of the statute will control. There is no room here for the sort of judicial legislation found in the *Santana* opinion. Judicial discretion should be applied only when a literal application of the statute would lead to an absurd or unconstitutional result. See, e.g., *Public Citizen v. Department of Justice*, 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989); *Green v. Bock Laundry Machine Company*, 490 U.S. 504, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989). In all other circumstances, the language of the statute controls. *Patterson v. Shumate*, 504 U.S. 753, 757, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992) (In interpreting § 541(c)(2), "the plain language of the Bankruptcy Code is our determinant."); *Toibb v. Radloff*, 501 U.S. 157, 160–62, 111 S.Ct. 2197, 2199–2200, 115 L.Ed.2d 145 (1991) ("In our view, the plain language of the Bankruptcy Code disposes of the question before us.... The language of § 109 is not unclear."); *United States v. Ron Pair Enterprises*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."); *Consumer Product Safety Commission v. GTE Sylvania*, 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980).[16]

**16.** This court is aware that the Supreme Court has also generated a contrary line of authority, in which the court used a method of reasoning similar to that in *Santana* and *Luna*, and gave the legislative history of a statute more credence than the text of the statute itself. Justice Brennan defended this practice in *Public Citizen*, 491 U.S. at 453 n. 9, 109 S.Ct. at 2566 n. 9. Justice Brennan also cited *Church of the Holy Trinity v. United States*, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892) in defense of the proposition that judicial legislation is both practical and desirable. In his concurring opinion in *Public Citizen*, Justice Kennedy examined the *Holy Trinity* case. 491 U.S. at 473–74, 109 S.Ct. at 2576–77 (concurring opinion of Kennedy, J.). The case involved a statute that, by its terms, clearly outlawed the facilitation, assistance or encouragement of any alien's entry into this country for the purpose of gainful employment. Justice Kennedy pointed out that the *Holy Trinity* case was one in which the

"central support for the Court's ultimate conclusion that Congress did not intend the law to cover Christian ministers is its lengthy review of the 'mass of organic utterances' establishing that 'this is a Christian nation,' and which were taken to prove that it could not 'be believed that a Congress of the United States intended to make it a misdemeanor for a church of this country to contract for the services of a Christian minister residing in another nation.'"

*Id.* at 474, 109 S.Ct. at 2577. This Court agrees with Justice Kennedy that the *Holy Trinity* case establishes a doctrine that is, by its very nature, subject to abuse. When faced with two contradictory lines of authority regarding the nature of statutory construction, this Court finds the line of authority that is based on neutral legal principles to be more instructive than that based on nothing more than the unsanctioned will of the judge or judges writing the opinion.

The Supreme Court also provided some guidance with respect to the sorts of statutes it finds to be absurd. One of the most striking of the opinions that found no absurdity, and mandated adherence to the letter of the law (rather than to a court's conjecture concerning its spirit) is *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982). Griffin had been Oceanic's employee. He was injured while aboard Oceanic's vessel, and the lower court found that the injury was caused by a lack of seaworthiness in the vessel. Griffin's employment was terminated on April 5, 1976, four days after he was injured. In addition, Oceanic wrongfully refused to pay to Griffin $412.50 it had withheld from his wages. In 1978, Griffin brought an action under the Jones Act for damages, medical expenses, and penalties. The Jones Act provided that Oceanic was to pay a penalty of double Griffin's daily wage for "each and every day" that payment of the $412.50 was delayed. *Griffin*, 458 U.S. at 569, 102 S.Ct. at 3249. Payment occurred on September 17, 1980, four and a half years after the wages were due. A literal application of the statute would result in a penalty of well over $300,-000. The District Court awarded the penalty wages, but invoked a well-established judicially created limitation on the statute. That limitation stated that the court could, in its discretion, determine the length of time for which the penalty wages would be assessed. Id. The District Court determined that the relevant time should be 34 days, which was the amount of time that Griffin was unemployed. Griffin appealed the determination of penalty wages, and the Fifth Circuit affirmed. It "believed itself bound by prior decisions within the Circuit, which left calculation of the penalty period to the sound discretion of the district courts." *Griffin*, 458 U.S. at 568, 102 S.Ct. at 3249.

The Supreme Court reversed, stating that "the words chosen by Congress, given their plain meaning, leave no room for the exercise of discretion either in deciding whether to exact payment or in choosing the period of days by which the payment is to be calculated ." Id. at 570, 102 S.Ct. at 3250. The court continued: "in rare cases, the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling. . . . This, however, is not the exceptional case." Id. at 571, 102 S.Ct. at 3250. The Supreme Court concluded that the statute must be applied as written, and rejected Oceanic's argument that such an application would be absurd. "Laws enacted with good intention ... frequently, and to the surprise of the lawmaker himself, turn out to be mischievous, absurd, or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts." *Griffin*, 458 U.S. at 575, 102 S.Ct. at 3252. See also *Demarest v. Manspeaker*, 498 U.S. 184, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991) (payment of witness fees to prisoners is not absurd, therefore statute must be applied as written).

One case in which the Supreme Court found that a Congressional enactment could not be applied as written was *Green v. Bock Laundry Machine Company*, 490 U.S. 504, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989). In that case, a prisoner on work release at a car wash lost his arm in an accident involving a large commercial dryer. He sued the manufacturer. At trial, he testified that he had been inadequately trained regarding the proper use of the dryer. The manufacturer impeached his testimony by eliciting admissions concerning two felony convictions. The jury found for the defendant. *Bock Laundry*, 490 U.S. at 506, 109 S.Ct. at 1983. The plaintiff appealed, arguing that the evidence concerning his criminal record should have been excluded. The Court of Appeals affirmed. After granting writs, the Supreme Court affirmed.

The legal question at issue in the case was the interpretation of Federal Rule of Evidence 609(a)(1), which directs the court to balance the probative value of the impeaching evidence against prejudicial effect "to the defendant." [17] Since the manufacturer was

---

17. Federal Rule of Evidence 609(a) provides:
For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during cross-examination but only if the

the defendant in the *Bock Laundry* case, it was certainly not prejudiced by the impeaching evidence. The court observed that under a literal interpretation of the Rule, evidence impeaching the credibility of a civil plaintiff would always be admissible, while evidence impeaching the credibility of a civil defendant would be admissible subject to the court's discretion. This unequal treatment of the two parties in a civil proceeding would run afoul of the Fifth Amendment's guarantee of due process. *Bock Laundry,* 490 U.S. at 510, 109 S.Ct. at 1985. In addition to the constitutional problems, the provision as written defied logic. "Evidence that a litigant or his witness is a convicted felon tends to shift a jury's focus from the worthiness of the litigant's position to the moral worth of the litigant himself. It is unfathomable why a civil plaintiff—but not a civil defendant should be subjected to this risk. Thus, we agree with the Seventh Circuit that as far as civil trials are concerned, Rule 609(a)(1) can't mean what it says." *Id.,* at 510–11, 109 S.Ct. at 1985 (citations omitted).

Although the Supreme Court never clearly outlined the parties' positions, one may infer that the plaintiff wanted the District Court to determine the prejudicial effect of the impeaching evidence to him, the plaintiff, rather than "to the defendant" as the Rule directs. He would have had the court read "to the defendant" as "to the plaintiff or defendant." The court concluded that there were three possible ways to interpret the word "defendant" that would give it a meaning that was both logically and constitutionally acceptable. The word "defendant" could be read as "witness," "party," or "criminal defendant." After surveying the evolution and legislative history of the Rule, the court rejected the plaintiff's position, and determined that the meaning of the word most likely to give effect to the apparent intent of Congress was the last: "criminal defendant." Id. Thus, the balancing test directed by Rule 609(a)(1) was proper only in a criminal case. While the plaintiff would have the District Court weigh prejudice in all civil cases, the court opted to

eliminate the balancing process from civil proceedings. Consequently, the district court in *Bock Laundry* acted properly in refusing to exclude the impeaching evidence; the Rule as interpreted by the Supreme Court mandated that such impeaching evidence be admitted in all civil cases. *Id.* at 527, 109 S.Ct. at 1994.

■ The outcome in *Bock Laundry* is not as relevant for present purposes as the method by which the Supreme Court reached its result. Only after determining that the Rule as written was arbitrary and violated due process did the court turn to the legislative history in an effort to determine what Congress meant by its poorly drafted enactment. Even then, the court engaged in a thorough analysis of the history and purpose of the Rule to ensure that both its letter and spirit were given the fullest effect consistent with logic and the Constitution. The court tried to preserve the Rule, rather than circumvent it. The above cases provide the Court with some guidance in its attempts to determine whether there is any substance to the conclusion drawn by some courts that a literal application of § 109(g)(2) to the facts of this case would generate an absurd result. A result is absurd if it is "unthinkable" or "bizarre". *Bock Laundry,* 490 U.S. at 527, 109 S.Ct. at 1994 (concurring opinion of Scalia, J.), or "demonstrably at odds with the intentions of its drafters." *Griffin,* 458 U.S. at 571, 102 S.Ct. at 3250. It is not absurd if it is merely "personally disagreeable," *Johnson v. Sawyer,* 120 F.3d 1307, 1319 (5th Cir.1997), or "mischievous" or "objectionable." *Griffin,* 458 U.S. at 575, 102 S.Ct. at 3252 (citing *Crooks v. Harrelson,* 282 U.S. 55, 60, 51 S.Ct. 49,50, 75 L.Ed. 156 (1930)).

■ ■ With these guidelines in mind, the Court turns to the statute under consideration. The situation that § 109(g)(2) is apparently designed to prevent is that of a debtor who files bankruptcy to forestall foreclosure, then dismisses his case after relief from stay is filed (or granted), only to file

crime (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and the court determines that the probative value

of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

again just when foreclosure is about to occur. If that is the purpose of the statute, it achieves its goal. Six months should be ample time for all but the most somnolent creditors to enforce their rights.

Since the statute effectively curbs the abuse it was designed to correct, the courts that refuse to apply it as written cannot find it absurd on the ground that it does not achieve its goal. Perhaps, instead, they conclude that the negative side effects of its application are so egregious that they far outweigh the benefits, to such an extent that the overall impact of the statute can be said to be one of the "rare cases" that leads to "a result demonstrably at odds with the intentions of its drafters." *Griffin*, 458 U.S. at 570, 102 S.Ct. at 3250. The negative side effects of the statute are, apparently, that some innocent debtors are also caught in the net and will, if they voluntarily dismiss their bankruptcy cases in circumstances that will trigger § 109(g)(2), be barred from seeking further bankruptcy relief for 180 days.

This Court does not find that possibility to cast an ominous shadow over the bankruptcy process. Certainly it isn't enough to render § 109(g)(2) unthinkable or bizarre, and certainly it isn't unconstitutional. There is no constitutional right to file a bankruptcy petition. Furthermore, living 180 days without being able to file bankruptcy is in no way comparable to being forced to pay $300,000 to compensate a $412 injury (a result that was held by the Supreme Court not to be absurd). There are few situations that this Court can imagine in which a debtor will be unable to endure life for six months without

the bankruptcy court's protection. The debtor should be aware of the consequences of a voluntary dismissal before seeking it, and can weigh the 180 day prohibition of refiling against the perceived benefits of dismissal. If he doesn't think he will survive for 180 days, he can maintain the pending case. It is difficult for this Court to conclude that § 109(g)(2) is absurd when its applicability is triggered only by a knowing, voluntary act of the debtor, who will generally be able to avail himself of the advice of counsel before seeking dismissal.[18]

The apparent absurdity of the statute as written is the rationale offered by the *Luna* court for its decision. The court stated that "mechanical application of section 109(g)(2) would reward Home Savings for acting in bad faith." *Luna*, 122 B.R. at 577. Refusal to apply a statute designed to prevent a debtor's misconduct is not an effective way to punish a wayward creditor. A more appropriate way to punish the creditor's violation of the automatic stay would have been through a finding of contempt, issuance of sanctions, or damages. See *In re Dickerson*, 209 B.R. at 707, and 11 U.S.C. § 362(h). Similar reasoning applies to the argument, presented at the hearing on this matter, that § 109(g)(2) will encourage creditors to automatically file motions for relief from stay in every case, in order to trigger the statute. Courts are armed with ample weapons against such abusive filings.

Some bankruptcy courts are apparently capable of unerringly detecting the will of the debtor. These courts can ferret out, on a case-by-case basis, a debtor's motives in fil-

---

**18.** By the way, if a debtor would, upon voluntary dismissal, be in default of a mortgage debt, why would the debtor voluntarily dismiss? One supposes that the debtor could be lured out of bankruptcy by the national servicing agent for Fannie Mae or Freddie Mac loans so that, despite the creditor's assertions that it would "work with" the debtor, the creditor immediately (and nefariously) commences foreclosure so as to be able to snare title and leave the poor debtor homeless. Please, Debtors, unlike seamen, are not to be seen as wards of the court, to be cared for outside the protections offered by the Bankruptcy Code. Just why would a debtor safely ensconced within a confirmed Chapter 13 case voluntarily dismiss? This Court has one answer—Because They Want To; and if they want to, they are

better off knowing the consequences before they do. This Court's guess is that this ruling will in fact dissuade debtors from fooling themselves into believing that there's a good reason to voluntarily dismiss a Chapter 13 case that's working. Of course, if the case is not working, the consequence of § 109(g)(2) applying is not "absurd," as dismissal will, one supposes, ultimately come involuntarily if the debtor simply waits. If a debtor seeks to do voluntarily what will be done involuntarily (thereby taking the debtor out of the ambit of § 109(g)(2)), even the most heartfelt of courts shouldn't have a problem applying the law, as then hasn't the debtor, in effect, chosen to fall within the proscription of § 109(g)(2)?

ing a motion for voluntary dismissal, and can determine whether and/or when it is appropriate to apply the law. This Court is not so perceptive or wise. In fact, it appears to this Court that Congress may have intended to avoid case-by-case adjudication when it drafted § 109(g)(2). Congress may have concluded that some debtors would be capable of convincing a bankruptcy court such as this one that their motives were pure, when in fact they were not. Alternatively, Congress may have determined that it wasn't worth the bankruptcy courts' time or effort to decide which debtors were attempting to abuse the system.

Finally, it seems completely rational to believe that Congress intended the statute to be applied as written, so that debtors would know the consequences of dismissal after a motion for relief from stay, and would avoid effectuating it voluntarily unless the benefits outweighed the downside. Courts who refuse to apply the law as written do no one, not even the debtors for whom they feel so, any favors. By creating a guessing game the risks increase as do the costs of protecting legal rights. It is enough work to apply the law and do it right. Do we need to create the extra class of litigation, i.e., over whether the law "ought" to apply this time or not?

The United States Constitution grants Congress the power to create uniform laws on the subject of bankruptcies. While some may believe that § 109(g)(2) leads to unjust results, the fact remains that it is entirely within the power of Congress to decide who will be a debtor, and under what conditions. It is not within the power of the bankruptcy courts, themselves creatures of Congressional act, to question the wisdom of a Congressional act that determines who may be a debtor in bankruptcy, through the conjuring maneuver of decrying, as absurd, consequences which are (to some) *felt* to be unfortunate.

### CONCLUSION

This Court concludes that an interpretation of § 109(g)(2) which gives each word its primary meaning leads to no absurd consequences. Therefore, the Court will interpret

the statute in such a fashion. Dismissal is required. A separate order has been issued.