**In re Magd Eldin ZOHDI, Debtor.**

**Dwayne M. Murray, Trustee, Plaintiff,**

v.

**The Louisiana State University Foundation, Defendant.**

Bankruptcy No. 97–12631.
Adversary No. 98–1087.

United States Bankruptcy Court, M.D. Louisiana.

June 7, 1999.

---

Dwayne M. Murray, Baton Rouge, Louisiana, for plaintiff.

Brett Furr, Brandon Black, Taylor, Porter, Brooks & Phillips, Baton Rouge, Louisiana, for defendant.

1. All citations to Title 11 of the United States Code will be shortened to "§ ____."

2. § 548(a)(2) reads as follows:

(2) A transfer of a charitable contribution to a qualified religious or charitable entity or organization shall not be considered to be a transfer covered under paragraph (1)(B) in any case in which—
    (A) the amount of that contribution does not exceed 15 percent of the gross annual income of the debtor for the year in which the transfer of the contribution is made; or
    (B) the contribution made by a debtor exceeded the percentage amount of gross annual income specified in subparagraph

*RULING*

LOUIS M. PHILLIPS, Bankruptcy Judge.

The issue before the Court, as best we can tell of first impression, is the proper interpretation of the Religious Freedom and Charitable Donation Protection Act of 1998 as it pertains to transfers avoidable under § 548[1] of the Bankruptcy Code. Does the "safe harbor" provision of § 548(a)(2)[2] allow a transferee to retain the portion of a pre-petition transfer that does not exceed 15 percent of the debtors gross income? For the reasons set forth herein, we find that if a transfer exceeds fifteen percent of the debtor's gross income and is otherwise avoidable under § 548, the entire transfer is avoidable, not merely that portion of the transfer exceeding 15 percent of the debtor's yearly income.

### I. FACTS AND PROCEDURAL HISTORY

The parties stipulate to all material facts: (i) the transferee—the Louisiana State University Foundation ("Foundation")—is a "qualified charitable entity" as defined by § 548(d)(3)[3]; (ii) the debtor/transferor—Magd Eldin Zohdi—had gross income in 1997 of $43,669.00; (iii) Mr. Zohdi made a single transfer of $10,000.00 to the Foundation in that same year, within a year before bankruptcy; (iv) Mr. Zohdi received nothing from the foundation in return for his contribution; (v) the $10,000.00 transfer exceeds 15 percent of Mr. Zohdi's gross income by $3,450.00;

(A), if the transfer was consistent with the practices of the debtor in making charitable contributions.

3. § 548(d)(3) reads as follows:

(3) In this section, the term "charitable contribution" means a charitable contribution, as that term is defined in section 170(c) of the Internal Revenue Code of 1986, if that contribution—
    (A) is made by a natural person; and
    (B) consists of—
    (i) a financial instrument (as that term is defined in section 731(c)(2)(C) of the Internal Revenue Code of 1986); or
    (ii) cash.

(vi) Mr. Zohdi was insolvent at the time of the transfer; (vii) Mr. Zohdi did not, during the year prior to his bankruptcy petition, have a practice of making charitable contributions; (viii) at least $3,450.00—representing the portion of the transfer exceeding 15 percent of the debtor's gross 1997 income—is avoidable; and, (ix) the remaining amount, $6,550.00, is the only amount in dispute.

Both parties' argumentative positions are easily stated. The trustee asserts that the "plain meaning" of § 548(a)(2) requires the avoidance of the entire transfer if it is greater than 15% of the debtor's gross income during the year in which the transfer was made. The Foundation asserts that only the portion of the transfer exceeding 15% of the debtor's gross income is subject to avoidance. The trustee's rendering of the statute, says the Foundation, is absurd (because a single "peppercorn" can subject an otherwise unavoidable transfer to avoidance), and, if endorsed by this Court, will undercut the intent of Congress (which is to protect transfers of up to 15% of a debtor's gross income from the application of § 548).

Summary judgment is proper in this case because "there is no genuine issue as to any material fact."[4] Over this proceeding we have both original jurisdiction and authority to issue a final order.[5]

## II. ANALYSIS

### A. Plain Meaning

#### 1. The Particular Statute

■ Though previously cited (*see footnote 2, supra*), we reiterate the portion of § 548 with which we are concerned:

**§ 548. Fraudulent transfers and obligations**

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

\*\*\*

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

\*\*\*

(2) A transfer of a charitable contribution to a qualified religious or charitable entity or organization shall not be considered to be a transfer covered under paragraph (1)(B) in any case in which.—

(A) the amount of that contribution does not exceed 15 percent of the gross annual income of the debtor for the year in which the transfer of the contribution is made;

\*\*\*[6]

We glean the following from the text of the statute: (i) the trustee may avoid the $10,000 contribution ("any transfer") if the insolvent Mr. Zohdi received less than reasonably equivalent value from the Foundation (for the transfer); *but,* (ii) the contribution is not subject to the reasonably equivalent value requirement (§ 548(a)(1)(B)) in any case in which the amount of that contribution is less than or equal to 15 percent of the debtor's gross annual income. Thus, by the terms of the statute, transfers of 15% or less are excepted from the requirement that they be for reasonably equivalent value because they are excluded from the universe of transfers that can be found to have been made for less than reasonably equivalent value.

---

4. *Celotex v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed. R.Civ.P. 56(c); Fed.R.Bank.P. 7056.

5. 28 U.S.C. § 1334(b); 157(a) and (b)(2)(H). (West 1999). The parties have consented to the issuance of a final order by this Court.

6. 11 U.S.C. § 548(a)(2)(A) (West 1999).

The plain meaning of the text speaks clearly to the Foundation's bifurcation argument. If the amount of the transfer does not exceed the 15 percent amount, then that transfer is not subject to § 548(a)(1)(B). If that transfer exceeds the 15 percent amount, then that transfer (because the transfer is a transfer as defined in § 548(d)) is to be analyzed under and covered by § 548(a)(1)(B), for the purpose of determining whether the transfer is avoidable as having been made for less than reasonably equivalent value. Thus, the plain text of the Religious Liberty and Charitable Donation Protection Act characterizes *transfers* as either covered by and analyzed under § 548(a)(1)(B) or excluded from coverage by, and the applicability of, the subsection.

Because the transfer at issue was for greater than 15% of the debtor's annual gross income during the year of the transfer, the transfer does not fall within the exception carved out by § 548(a)(2), and is therefore covered by and to be analyzed under § 548(a)(1)(B) for purposes of determining whether the transfer was for less than reasonably equivalent value.

To this Court the meaning of the statute, by its own terms, is clear. However, mindful that we lower federal courts have been instructed that we should interpret the meaning of the words of a particular statute within the context of the statute as a whole,[7] we broaden to a contextual analysis and are even more convinced that we are right.

We will look, of course, to other parts of the bankruptcy code, and other federal statutes. Before moving there we mention (again) that the Foundation argues that the statute should be interpreted to exclude from applicability of § 548(a)(1)(B) that portion of the transfer that is equal to or below 15% of gross income, which subjects only the excess to avoidability. To so interpret the provision, however, we must rewrite it. We offer a couple of proposed versions of a rewrite that would generate the interpretation suggested by the Foundation, for the purposes of: (i) contrasting the rewrites with the actual statute; and (ii) showing that the pivotal language in the rewritten statutes is in fact widely used when Congress wishes to provide for exactly the kind of bifurcation the Foundation is arguing we should say is provided for by § 548(a)(2). Our rewrites:

1. A transfer ... shall not be considered a transfer covered under paragraph (1)(B) *in (A) an amount not to exceed 15 percent* ...

2. A transfer ... shall not be considered a transfer covered under paragraph (1)(B) *up to —*

   *(A) an amount equal to 15 percent* ...

3. A transfer ... shall not be considered a transfer covered under paragraph (1)(B) *except to the extent that—*

   *(A) the amount of the contribution exceeds 15 percent* ....

Any one of these rewrites would generate the interpretative conclusion urged by the Foundation. Note that in each of the rewrites we have had to dispense with the phrase "in any case in which" because the choice by Congress of this phrase requires that we be talking about the transfer itself, as opposed to a portion of the transfer (or, said another way, we have attempted re-

---

7. In actuality this "directive" has its exceptions, none of which is capable of being articulated. It appears that when undertaking statutory analysis, it is acceptable at undeterminable times to dispense with contextual analysis to further the process by which a court seeks to arrive at a result that requires the disembodiment of the particular statute being dealt with. *See, e.g., Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). Because we are not smart enough to know when it is acceptable to forget that a statute is placed within a context of others, and are made anxious by the prospect of making up what statutes should have said to get to what we want the statute to say so that it can mean what we want it to mean, we utilize a rather unimaginative version of textual construction.

writes leaving the phrase but cannot write one that makes sense).

## 2. The Particular Statute Within the Context of the Bankruptcy Code and a Companion Federal Statute.

Why not start with the companion subsection to § 548(a)(2)(A), which refers to the circumstances under which it may be possible for a transferee to defend against an avoidance action even if the transfer is for greater than 15% of the annual gross income of the debtor during the year in which the transfer was made?

Section 548(a)(2)(B) reads as follows:

(2) A transfer of a charitable contribution to a qualified religious or charitable entity or organization shall not be considered a to be a transfer covered under paragraph (1)(B) in any case in which—

\*\*\*

(B) the contribution made by a debtor exceeded the percentage amount of gross annual income specified in subparagraph (A), if the transfer was consistent with the practices of the debtor in making charitable contributions.

The statute refers to *a transfer* that exceeds the 15% amount. The section insulates *the transfer* (the entirety of the transfer), only if *the contribution* exceeds the 15% amount, if *the transfer* "was [singular usage] consistent with the practices of the debtor in making charitable contributions" (note the plural usage which distinguishes this reference from all other references to a contribution).[8] The import

of the meaning reflected in subsection (B) is evident. If Congress had meant to expose only the amount in excess of the 15% of gross income, then it had the perfect opportunity to make that clear in subsection (B) by referring to the portion of the transfer otherwise subject to avoidance. Subsection (a)(2)(B) broadens the exception contained in subsection (a)(2)(A) to include additional transfers, rather than portions of transfers over the 15% of annual income amount. Because it is the transfer that can be brought within the blanket of (a)(2) by a showing that "the transfer was consistent with the practices of· the debtor in making charitable contributions," we think it impossible to conclude other than that subsection (a)(2)(B) is talking about the entire transfer and is requiring that the entire transfer fit the consistency requirement, before it can be brought within the safe harbor of § 548(a)(2).

As with our rewriting of subsection (a)(2)(A), we offer three examples of § 548(a)(2)(B), rewritten to provide a counterpart to our examples of rewritten § 548(a)(2)(A):

1. A transfer of a charitable contribution ... shall not be considered a transfer covered under paragraph (1)(B) *in an amount not to exceed —*

   *(A) fifteen percent ..., or*

   *(B) if greater than 15 percent ... in an amount not to exceed an amount that was consistent with the practices ...*

2. A transfer of a charitable contribution ... shall not be considered a

8. We mention the distinguishing usage of the plural "contributions" in the reference to the "practices" of the debtor with full recognition that § 102(7) of the Code establishes as a rule of construction that "the singular includes the plural." We understand that when the Code refers to "a transfer" or "the transfer" it does not intend to place a limit upon the number of transfers that might be avoidable, as the plural is included in the use of the singular. However, use of the singular is instructive when the question is whether a part of a transfer is not avoidable, because the singular

is used to connote a self-contained whole thing. The reference to "contributions" makes sense. Suppose Dr. Zohdi had made (1) annual contribution of $10,000 for some number of years. Section 548(a)(2)(B) allows this Court to look beyond the one-year period (or to analyze the contributions within the one-year period) to determine whether there was a practice of making contributions, and if so, whether the transfer at issue fits the practice. In the case before us, we are aware of only one contribution, period.

transfer covered under paragraph (1)(B) *up to* —

*(A) an amount equal to 15 percent, or*

*(B) if the contribution made by the debtor exceeded the percentage amount of gross income specified by subparagraph (A), up to the amount that was consistent with the practices* ...

3. A transfer of a charitable contribution ... shall not be considered a transfer covered under paragraph (1)(B) *except to the extent of*—

*(A) the amount of 15 percent* ..., *or*

*(B) if greater than 15 percent* ... *to the extent that the transfer was consistent with the practices* ...

Any of these rewrites would offer language consistent with an intention to except from the applicability of § 548(a)(1)(B), additional portions of transfers, above the 15% limitation, up to, to the extent that, or in an amount not to exceed the consistently practiced giving of contributions to the transferee. The subsections, as rewritten by us, would require the interpretation urged by the Foundation. However, the rewritten subsections are markedly different from the subsections as actually written by Congress.

Though the parties have stipulated that the $10,000.00 transfer was one covered by the definition of "charitable contribution" as the term is used in § 548(a)(2), the actual definition was not explored by either side. We think it advances our interpretive understanding to look into whether the definition of "charitable contribution" sheds any light on whether we have correctly read the statute.

According to § 548(d)(3), "the term 'charitable contribution' means a charitable contribution, as that term is defined in section 170(c) of the Internal Revenue Code of 1986 ..."[9] The focus of the charitable contribution provisions of the Internal Revenue Code is upon the type of entities that qualify to receive a deductible contribution. Important to our inquiry, though, is that the term " 'charitable contribution' means a contribution or gift to or for the use of ..." In other words, the statute requires that each contribution be determined to be a "charitable contribution" for purposes of deductibility. To determine the limit of deductions, subsection 730(b) provides that "a deduction" shall be allowed "to the extent that the aggregate of such contributions does not exceed ..."

So, the statute providing the definition of "charitable contribution" distinguishes between the aggregate and individual contributions. Each contribution must be analyzed to determine whether the specific contribution fits the definition, and the individual contributions are looked at, in the aggregate, for purposes of a deductibility limit. Therefore, there is nothing to be gleaned from the statute providing the definition of "charitable contribution," that would provide a basis for dividing the contribution into parts (what we were thinking in looking here is that perhaps the definition of charitable contribution might refer to an aggregate amount or provide some other basis on which to conclude that the term, as defined, was susceptible of bifurcation. It does not).

We next note that within the Bankruptcy Code Congress has seen fit to use phrases such as "to the extent of," "to the extent that," "not to exceed," etc., when it has wanted to provide for bifurcation of an amount, item of property, claim, etc.

9. Because the parties have stipulated as a fact that the contribution is a "charitable contribution" as the term is defined, we need not address whether the contribution was made in the form required by § 548(d)(3)(B)(i) or (ii). Because the two alternative modes of contribution are by cash or financial instrument, as that term is defined in section 731(c)(2)(C) of the Internal Revenue Code of 1986, there may be an issue as to whether a contribution by personal check qualifies as a charitable contribution. Because we assume the contribution at issue qualifies, but find the entire transfer avoidable, we need not address the question of whether we are even dealing with a "charitable contribution."

For example, the phrase "not to exceed" is used eight times in § 522(d) [10] and allows those debtors availing themselves of this federal exemption to exempt varying interests in types of property, *not to exceed* a certain value. This exemption method requires that if the value of the property to be exempted is greater than the amount provided for in the statute, the excess value be estate property.

Section 507(a) [11] makes similar use of the phrase "to the extent of." Specified unsecured claimants are allowed a heightened priority under that article *to the extent of* a certain claim amount. "To the extent of" is also the phraseology used in § 506(a) [12]

10. § 522. Exemptions

\*\*\*

(d) The following property may be exempted under subsection (b)(1) of this section:

(1) The debtor's aggregate interest, *not to exceed* $16,150 in value, in real property or personal property that the debtor or a dependent of the debtor uses as a residence, in a cooperative that owns property that the debtor or a dependent of the debtor uses as a residence, or in a burial plot for the debtor or a dependent of the debtor.

(2) The debtor's interest, *not to exceed* $2,575 in value, in one motor vehicle.

(3) The debtor's interest, *not to exceed* $425 in value in any particular item or $8,625 in aggregate value, in household furnishings, household goods, wearing apparel, appliances, books, animals, crops, or musical instruments, that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor.

(4) The debtor's aggregate interest, *not to exceed* $1,075 in value, in jewelry held primarily for the personal, family, or household use of the debtor or a dependent of the debtor.

(5) The debtor's aggregate interest in any property, *not to exceed* in value $850 plus up to $8,075 of any unused amount of the exemption provided under paragraph (1) of this subsection.

(6) The debtor's aggregate interest, *not to exceed* $1,625 in value, in any implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor.

(7) Any unmatured life insurance contract owned by the debtor, other than a credit life insurance contract.

(8) The debtor's aggregate interest, *not to exceed* in value $8,625 less any amount of property of the estate transferred in the manner specified in section 542(d) of this title, in any accrued dividend or interest under, or loan value of, any unmatured life insurance contract owned by the debtor under which the insured is the debtor or an individual of whom the debtor is a dependent.

\*\*\*

(D) a payment, *not to exceed* $16,150, on account of personal bodily injury, not including pain and suffering or compensation for actual pecuniary loss, of the debtor or an individual of whom the debtor is a dependent[.]

11 U.S.C. § 522(d) (West 1999) (emphasis added).

11. § 507. Priorities

(a) The following expenses and claims have priority in the following order:

(1) First, administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under chapter 123 of title 28.

(2) Second, unsecured claims allowed under section 502(f) of this title.

(3) Third, allowed unsecured claims, *but only to the extent* of $4,300 for each individual or corporation, as the case may be, earned within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for—

\*\*\*

(5) Fifth, allowed unsecured claims of persons—

(A) engaged in the production or raising of grain, as defined in section 557(b) of this title, against a debtor who owns or operates a grain storage facility, as defined in section 557(b) of this title, for grain or the proceeds of grain, or

(B) engaged as a United States fisherman against a debtor who has acquired fish or fish produce from a fisherman through a sale or conversion, and who is engaged in operating a fish produce storage or processing facility— *but only to the extent of* $4,300 for each such individual.

(6) Sixth, allowed unsecured claims of individuals, *to the extent of* $1,950 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided.

\*\*\*

11 U.S.C. 507(a)(1)–(6) (West 1999).

12. § 506(a) reads:

where secured claims are allowed *"to the extent of* the value of such creditor's interest in the estate's interest in such property, or *to the extent of* the amount subject to setoff...."  Within this statute the claim is required to be bifurcated into a secured and unsecured claim if the claim amount exceeds the secured value.

"To the extent that" is used in § 523(a)(5) and (7) to render certain claims nondischargeable *to the extent that* the claim is in the nature of maintenance or support, or for a fine, penalty, or forfeiture.[13]  "To the extent that" is also used in § 524(a)(1)[14] to limit the extent to which a judgment is voided by a discharge so that the judgment remains effective upon property owned pre-bankruptcy but cannot be exercised against the discharged debtor, personally;  is used to define those community interests becoming property of the estate under § 541(a)(2);[15] and is used in limiting the personal liability of certain general partners under § 723(a).[16]

> (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

13. § 523(a)(5) and (7) read as follows:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> \*\*\*
>
> (5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—
>
> (A) such debt is assigned to another entity, voluntarily, by operation of law, or otherwise (other than debts assigned pursuant to section 408(a)(3) of the Social Security Act, or any such debt which has been assigned to the Federal Government or to a State or any political subdivision of such State); or
>
> (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support;
>
> \*\*\*
>
> (7) to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty—
>
> (A) relating to a tax of a kind not specified in paragraph (1) of this subsection;  or
>
> (B) imposed with respect to a transaction or event that occurred before three years before the date of the filing of the petition;

14. § 524(a)(1) reads as follows:

> (a) A discharge in a case under this title—
> (1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title, whether or not discharge of such debt is waived[.]

15. § 541(a)(2) reads as follows:

> (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate.  Such estate is comprised of all the following property, wherever located and by whomever held:
>
> \*\*\*
>
> (2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is—
>
> (A) under the sole, equal, or joint management and control of the debtor;  or
>
> (B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

16. § 723(a) reads as follows:

> (a) If there is a deficiency of property of the estate to pay in full all claims which are allowed in a case under this chapter concerning a partnership and with respect to which a general partner of the partnership is personally liable, the trustee shall have a claim against such general partner to the extent that under applicable nonbankruptcy

There are, as well, companion statutes to the amended § 548(a)(2). Section 544(b)(2) [17] now excludes from the avoidance provision of § 544(b)(1)—"a transfer" that "is not covered by" § 548(a)(1)(B) because of § 548(a)(2). The same language is used, then, in § 544(b)(2), as in § 548(a)(2). However, § 1325(b)(2)(A), [18] is written in a completely different manner from either § 548(a)(2)(A) or (B), or § 544(b)(2). Under this statute the disposable income requirement of § 1325(b)(2) was modified to allow debtors to contribute "an amount *not to exceed* 15 percent of the gross income of the debtor" to a qualified charitable entity per year. [19] We are not pressed, as part of our interpretative endeavor, to figure out why Congress, within the same act, described the newly allowable charitable contribution(s) so differently. [20] We note, however, that it did so.

17. Section 544(b)(2) reads as follows:

(b)(2) Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2). Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.

18. § 1325. Confirmation of Plan
\*\*\*
(b)(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—
(A) for the maintenance or support of the debtor or a dependent of the debtor, including charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)) in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made;
\*\*\*
11 U.S.C. § 1325(2)(A) (West 1999).

19. *But see, In re Buxton*, 228 B.R. 606 (Bankr. W.D.La.1999) (§ 1325(b)(2)(A) still subject to "reasonable necessity" in § 1325(b)(2)).

20. We think, in fact, that the language of § 548(a)(2) can create a mischievous result. Because the statute refers to a transfer as the thing which cannot exceed the 15% amount, § 548(a)(2) probably requires a trustee to make a transfer-by-transfer determination, as opposed to allowing a trustee to aggregate transfers to get to an amount equal to 15% of the gross income for the year and avoid all others made within the year. Though we need not address this question here, as we have only one transfer and it exceeded the 15% amount, we point to § 547(c)(8), which has been held to allow the aggregation of all transfers to a particular creditor during the preference period to determine whether the $600 threshold has been exceeded. *Electric City Merchandise Co. v. Hailes (Matter of Hailes)*, 77 F.3d 873 (5th Cir.1996) Debtor allowed to aggregate multiple transfers in reaching the $600 mark. Court relied upon the use of the terms "aggregate" and "all" as well as the statutory construction rule mandating that the singular denotes the plural (§ 102(7)). We note that the statute (§ 547(a)(8)) contains the phrase "aggregate value of all property that constitutes or is affected by such transfer is less than $600." There is no such reference (to "aggregate" anything) within § 548(a)(2). Perhaps the assumption underlying § 548(a)(2) is that no single transfer will exceed 15% of the debtor's gross income, because of the operation of "contribution base" limitations contained in 26 U.S.C. § 107(b) (that is, because the most widely applicable percentage limitation is 30% of contribution base—adjusted gross income without regard to "any net operating loss carryback to the taxable year"—most would not make a charitable contribution in excess of 15% of gross income because of deductibility limitations). However, we note that the statutes serve different purposes. Section 548(a)(2) insulates a transferee from having to repay the estate out of its own coffers, for a transfer that probably has already been spent, and the realities of such actions include the probability that the estate's lawyers will get a share and that the trustee (through compensation) will get a share, thereby "reducing" the extent to which the creditors receive a benefit. Section 1325(b) delineates the scope of a debtor's post-petition (usually monthly) disposable income going forward for a limited amount of time (the term of the plan). Because it is clear that Congress (and the creditor lobby) favors Chapter 13 (expanded discharge, etc.,

We mention the foregoing examples of Congressional use of language expressly providing for a bifurcation of property, claims, and rights, including an example contained within the very act spawning § 548(a)(2), to show that when Congress wanted to carve out a piece of something, it knew how and was willing to do so through phases such as we have suggested it would have used had that been its intent in drafting § 548(a)(2). Congress knew how to write a statute so that it actually read like one of our rewrite versions. It chose not to, within the two avoidance sections modified by the Religious Liberty and Charitable Donation Protection Act of 1998.

### 3. Even If the Meaning Be Plain, Is It Absurd?

■■■ The Foundation does not seriously contest the plain meaning of the Religious Liberty and Charitable Donation Protection Act amendments. Instead the Foundation argues that a literal application of the statute results in absurdity, and that this Court must therefore look beyond the plain language to discern the intention of Congress. The "absurdity doctrine," of course, is that the plain meaning of the statutory language controls, unless literal application would lead to an unconstitutional or absurd result. We have described the plain meaning, or absurdity doctrine before:

> The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning. Wolas, 502 U.S. at 157, 112 S.Ct. at 531 (citations omitted) (italics added). The above language makes it perfectly clear that when a conflict

exists between what Congress said and what Congress presumably intended, the language of the statute will control. There is no room here for the sort of judicial legislation found in the Santana opinion. Judicial discretion should be applied only when a literal application of the statute would lead to an absurd or unconstitutional result. See, e.g., Public Citizen v. Department of Justice, 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989); Green v. Bock Laundry Machine Company, 490 U.S. 504, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989). In all other circumstances, the language of the statute controls. Patterson v. Shumate, 504 U.S. 753, 757, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992) (In interpreting § 541(c)(2), "the plain language of the Bankruptcy Code is our determinant."); Toibb v. Radloff, 501 U.S. 157, 160–162, 111 S.Ct. 2197, 2100–2200, 115 L.Ed.2d 145 (1991) ("In our view, the plain language of the Bankruptcy Code disposes of the question before us.... The language of § 109 is not unclear."); United States v. Ron Pair Enterprises, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."); Consumer Product Safety Commission v. GTE Sylvania, 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980).[21]

The Foundation argues in brief that, according to the "plain meaning" of the text, "if the debtor makes a charitable contribution less than or equal to 15 percent of gross annual income, then the transfer is not avoidable; however, if the debtor

---

for now), it makes some sense for Congress to put an annual cap on allowed charitable contributions. In courts where charitable contributions were not allowed, it is pretty clear that each dollar would have gone to actual creditors (less the trustee's compensation, which in most cases is less than the statutory 10%) because there is no recovery action involved. Finally, within Chapter 13 we are

dealing with debtors who next meet eligibility requirements (including a limited amount of unsecured and secured debt), so as a practical matter, the Chapter 13 debtor is by statute the "up to but no more" borrower, unlike the Chapter 7 debtor.

21. *In re Richardson*, 217 B.R. 479, 489 (Bankr.M.D.La.1998) (footnote omitted).

makes a transfer which is 1 penny over 15 percent of gross annual income, then the entire transfer is avoidable...."[22] Because of this version of the "peppercorn problem," the statute, as written, is arbitrary and absurd.[23]

The problem with this argument is that "bright line" tests—such as the one found in § 548(a)(2)—are prevalent in the Code. For instance (as mentioned), § 547 prohibits preference actions against consumer debtors where the aggregate value consti-

tuting the transfer is less than $600.[24] Section 523(a)(2)(C) creates a presumption of nondischargeability of consumer debts or cash advances owed a single creditor aggregating more than $1,075, if obtained within a particular number of days (60) before bankruptcy.[25] Section 109(e) specifies that a party owing unsecured debt equal to, or greater than, $269,250 is prohibited from becoming a debtor under chapter 13.[26] Sections 303(b)(1) and (2) set at $10,775 the aggregate amount necessary to maintain certain types of involuntary

**22.** *Defendant's Opposition to Motion for Summary Judgment Filed by Trustee*, page 2, March 26, 1999.

**23.** We point out here that the "peppercorn problem" is of limited utility to a party attacking the language of a statute, or even to a Supreme Court Justice criticizing the majority opinion of another. In *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 549, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994), Justice Scalia, writing for the court, insulated properly conducted judicial foreclosure sales from attack as fraudulent conveyances notwithstanding the dissent, which (through Justice Souter) pointed out that "[t]he Court today holds that by the terms of the Bankruptcy Code Congress intended a peppercorn paid at a noncollusive and procedurally regular foreclosure sale to be treated as the 'reasonabl[e] equivalent' of the value of a California beachfront estate ..."

**24.** § 547. Preferences
\*\*\*
(c) The trustee may not avoid under this section a transfer—
\*\*\*
(8) if, in a case filed by an individual debtor whose debts are primarily consumer debts, the aggregate value of all property that constitutes or is affected by such transfer is less than $600.
11 U.S.C. § 547(c)(7) (West 1999).

**25.** § 523. Exceptions to discharge
(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
\*\*\*
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a state-

ment respecting the debtor's or an insider's financial condition;
\*\*\*
(C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $1,075 for "luxury goods or services" incurred by an individual debtor on or within 60 days before the order for relief under this title, or cash advances aggregating more than $1,075 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief under this title, are presumed to be nondischargeable; "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Credit Protection Act;
\*\*\*
11 U.S.C. § 523(a)(2)(C) (West 1999).

**26.** § 109. Who may be a debtor
\*\*\*
(e) Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $269,250 and noncontingent, liquidated, secured debts of less than $807,750, or an individual with regular income and such individual's spouse, except a stockbroker or a commodity broker, that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than $269,-250 and noncontingent, liquidated, secured debts of less than $807,750 may be a debtor under chapter 13 of this title.
\*\*\*
11 U.S.C. § 109(e) (West 1999).

bankruptcy petitions.[27]  Under these examples, one dollar, or even one penny, can tip the scales to allow or preclude avoidance of a preference, cause or do away with a presumption of nondischargeability of debt, make a debtor eligible or ineligible for chapter 13 relief, or give rise to or defeat an involuntary bankruptcy petition.

Under the Foundation's logic most date limits would also be rendered absurd. Consider the preference period.[28]  A preferred payment to a non-insider 91 days pre-petition is not a preference.  But the same payment made a day earlier can result in a preference.  The fraudulent transfer statute itself is subject to a one-year rule.[29]

What about statutes of limitation (prescriptive periods)?  A million dollar tort suit in Louisiana is worth one million dollars if filed within one year of the accident.[30]  The same suit is worthless the very next day (at least against the original defendant).  Consider, finally, Louisiana's death penalty statute.[31]  A person who commits murder against a person who is one day shy of age 65 is subject to life imprisonment.  The same act, committed against the same person the very next day (after age 65 has been reached), subjects the murderer to the death penalty.

■  The doctrine of absurdity has been recently examined both by this court and by the Fifth Circuit.  In the case *In re Richardson*[32] we found absurdity to require that a statute be "unthinkable" or "bizarre," [33] or "demonstrably at odds with the intentions of its drafters." [34]  But the statute is not absurd if it is merely "personally disagreeable," [35] "mischievous," or "objectionable." [36]  Our absurdity analysis is bolstered by the recent Fifth Circuit case *Andrews & Kurth L.L.P. v. Family Snacks, Inc. (In re Pro–Snax Distribs. Inc.)*, 157 F.3d 414 (5th Cir.1998).[37]  In that case the court faced the interpretation of a bankruptcy statute (§ 330) in which Congress had, perhaps accidentally, omitted the phrase "or to the debtor's attorney."  Prior to its amendment, the statute allowed fees to be paid to "a trustee, to an examiner, to a professional person employed under section 327 ..., *or to the debtor's attorney.*"  After the amendment, the statute allowed fees only to "a trustee, to an examiner, to a professional person

27.  § 303.  Involuntary cases

\*\*\*

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $10,775 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
(2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $10,775 of such claims[.]
\*\*\*
11 U.S.C. § 303(b)(1)–(2) (West 1999).

28.  11 U.S.C. § 547(b)(1)(A) (West 1999).

29.  11 U.S.C. § 548(a)(1) (West 1999).

30.  La.Civ.Code Ann. art. 3492 (West 1999).

31.  La.Rev.Stat.Ann. § 14:30 (West 1999).

32.  217 B.R. 479 (Bankr.M.D.La.1998).

33.  *Id.,* at 491.  *Quoting Green v. Bock Laundry Machine Co.,* 490 U.S. 504, 527, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989).

34.  *Richardson,* at 491.  *Quoting Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982).

35.  *Richardson,* at 491.  *Quoting Johnson v. Sawyer,* 120 F.3d 1307, 1319 (5th Cir.1997).

36.  *Richardson,* at 491.  *Quoting Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982).

37.  157 F.3d 414 (5th Cir.1998).

employed under section 327." Although there were several indications that Congress merely gaffed with the omission, the Fifth Circuit considered itself duty-bound to render a close reading of the statute.

> We decide the issue before us bound by our conventions of statutory construction, even though common sense might lead the lay observer to conclude that a different result is perhaps more appropriate. The law, and the rules to which we adhere in order to interpret it, does not always conform to the dictates of common sense. In this case, we are faced with a statute which is clear on its face. It excludes attorneys from its catalog of professional officers of a bankruptcy estate who may be compensated for their work after the appointment of a Chapter 11 trustee. Although the legislative history and, indeed, a brief syntactical evaluation of the clause at issue suggest that Congress inadvertently neglected to include attorneys, our canons of construction do not require—nay, do not permit—us to consider these exogenous sources when the statute is clear textually on its face.[38]

■ While the "plain language" of § 548(a)(2) is perhaps arbitrary (in the sense that Congress could just as easily have used 9%, 33%, 19%, or any other such percentage), it is neither "bizarre," "unthinkable," or "demonstrably at odds with the intentions of its drafters." We do not disagree with the thrust of the Foundation argument, that hinging the avoidability of a transfer upon an amount limitation that can be upset by the addition of one penny, seems arbitrary. However, by pointing out that our law is replete with such limitations, we hope to have shown that "arbitrary" is not synonymous with "absurd." In fact, the picking of an amount or time limitation, for purposes of establishing eligibility, avoidability, existence of claim, nondischargeability, fixing of punishment,

etc. is, not arbitrary, because such limitations, deadlines, entitlements are confected through the exercise of the process by which legislative will is hammered into singular statement. It is what Congress does.

So, we readily admit that the discernable significance of the 15% amount is only that Congress decided to "draw the line" where it did. Because of the presumed authority to draw such a line (and many others in other places), we are bound to abide by that line.

One more thing. The Foundation seemingly fails to consider that the protection offered a transferee by § 548(a)(2) is itself built upon a "fiction," albeit one (like the 15% amount) that Congress presumably has authority to graft into a bankruptcy statute. The transferor of a charitable donation does not receive "reasonably equivalent value" for the contribution; the transferee has given no consideration. Congress, in an effort to protect religious organizations and charities, is merely legislating that they are excepted from this requirement. The 15 percent limitation is no more absurd than attribution of reasonably equivalent value to a "contribution"; it is also no more or less arbitrary.

### 4. Should We Consider Other Sources of Legislative Intent?

■ The Foundation also directs the court's attention to various formats of purported legislative pronouncement was to Congress' intent in promulgating § 548(a)(2). However, "in interpreting the Bankruptcy Code, 'as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute[;]' "[39] Following this canon of statutory construction, we likewise decline to examine these sources.

---

**38.** *Id.* at 425.

**39.** *In re Gamble,* 143 F.3d 223 (5th Cir.1998); quoting *United States v. Ron Pair Enters., Inc.,*

489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *See also In re Richardson,* 217 B.R. at 488–89, n. 15–16.

## B. Constitutionality of § 548(a)(2)

While we note that at least one court has already found § 548(a)(2) to be Constitutional,[40] because we have disposed of the defense to the trustee's avoidance action on statutory grounds, we express no opinion as to the Constitutionality of the new protections afforded charitable and religious organizations pursuant to the Religious Liberty and Charitable Donations Protection Act of 1998.

## C. Interest

Though the trustee did not specifically plead a right to pre-judgment interest, the allowance of pre-judgment interest is within the discretion of this Court. Previously, the Fifth Circuit has allowed pre-judgment interest in an avoidance action brought under § 548(a)(1)(B), concluding that as a matter of federal law, pre-judgment interest is awardable because the federal law creates the cause of action and the award of pre-judgment interest furthers the policies underlying § 548.[41] The allowance of pre-judgment interest involves the determination, under federal law, of the beginning moment of accrual and the proper rate. Though the federal law is specific as to a post-judgment rate, federal law provides no specific pre-judgment rate, which requires in many cases that the court refer to state law for guidance.[42]

Pre-judgment interest in this proceeding is appropriate. As mentioned in the *Texas General Petroleum* case,

"[t]he purpose of the statute [§ 548(a)(1)(B)] is to make the estate whole. Prejudgment interest compensates the estate for the time it was without the use of the transferred funds."[43] The beginning of accrual in some measure affects the extent to which the estate is made whole. There is no suggestion of actual fraud, as a ground for avoidance, and the transfer, under state law, was valid in form. Also, the defendant (along with the trustee) has admirably assisted the court in narrowing the issues inherent in this proceeding to the one legal issue which this opinion addresses so that the matter could be submitted some 90 days after the trustee's lawsuit was filed. The court concludes therefore that pre-judgment interest shall run from the date of judicial demand until entry of judgment, at the rate of 6.73 percent (the Louisiana State rate for 1999).

Post-judgment interest shall accrue on the aggregate of the principal amount plus pre-judgment interest at the federal rate of 4.879 percent per annum, compounded annually, until paid.

## III. CONCLUSION

Section 548(a)(2) clearly subjects a transfer that is a charitable contribution exceeding fifteen percent of the debtor's gross income for the year in which the contribution was made to the "reasonably equivalent value" requirement of § 548(a)(1)(B).[44] It is agreed here that no

---

40. *In re Witt*, 231 B.R. 92 (Bankr.N.D.Okla. 1999).

41. *Matter of Texas General Petroleum Corporation*, 52 F.3d 1330, 1339 (5th Cir.1995).

42. *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984 (5th Cir.1991); *United States ex rel. Canion v. Randall & Blake*, 817 F.2d 1188, 1193 (5th Cir.1987). *See also, Carpenters Dist. Council v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275, 1288 (5th Cir.1994).

43. 52 F.3d at 1339–1340.

44. One more footnote. If Congress wishes to write the statute (§ 548(a)(2)) to say what the

Foundation wants it to say, such could be done with little effort. Notwithstanding the arguments raised here, we are not so sure that the Foundation and other recipients of charitable contributions will not (after some thought) embrace this ruling (we care not). While the immediate harm to the Foundation is the avoidability of the entirety of the transfer before the court (and that has to hurt, if even a little bit), the ultimate effect of this ruling is arguably to insulate all transfers from avoidance under § 548(a)(2) that are (on a transfer-by-transfer basis) below the 15% amount, regardless of the aggregate amount of charitable contributions during the year

such value was given. As all other pertinent facts are stipulated, summary judgment, in conformity with these reasons, will be granted for the trustee.

A separate Judgment will issue.

before bankruptcy (or during the year within which the contribution was made). As a court we do not "like" this logical consequence of our ruling, as we recognize that had Dr. Zohdi made the contribution in two separate checks of $5,000, our analysis would compel us to find each contribution protected by the safe harbor of § 548(a)(2) (in so doing we would doubtless also be rejecting the trustee's suggestion that the plain meaning of the statute is absurd, in favor of the Founda-

tion's assertion that the plain meaning of the statute controls). Though distasteful sometimes, our job here is to read the statute, apply it as written to the facts, and, in so doing, present Congress with our view of what it has in fact wrought. If we are wrong in our conclusion as to what Congress has said, a reviewing court can tell us so. If we are right about what Congress has said, but it turns out that in fact Congress intended to say something else, Congress can say so and fix it.